Care, J.
The case agreed presents two questions: 1. Whether the plaintiff was or was not bound, under the ordinances, to pay a tax on the amount of goods of his own property, sold by him at auction ?' 2. Whether the plaintiff be entitled to recover back the sum of 178 dollars, supposing it to have been an overpayment ? ( This last, is the only question which I think it material to consider. It is substantially this: Can a party who has voluntarily paid mo *311 ney with a full knowledge of all the facts and circumstances, hut under a mistake as to the law, recover it back by an action for money had and received to his use ? I hold that he cannot; and if a multitude of adjudged cases can settle a point, 1 think there are few better settled in the law. ,•
In Billy v. Lumley, an underwriter had promised payment, with a knowledge of facts which would have released him from his contract, and, afterwards, attempted to avoid the promise on the ground of ignorance of the law. The court said, “ Every man must be taken to be conusant of the law. Otherwise, there is no saying to what extent the excuse of ignorance might be carried. It would be urged in almost every case.” Lundie v. Robertson was an action by the indorsee against, the indorser of á bill of exchange. The proof was, that throe months were suffered to elapse after the bill became due, before application was made to the indorser: when applied to, he promised to pay, if the indorsee would call again with the account. The defence set up, was want of proof of a due presentment of the bill for payment. Lord RUenborough said, “ The case does not admit of a doubt. The defendant is charged as indorser of a bill of exchange. 'When applied to for payment, he says he has no cash by him, but if the witness will call again, he will pay it. Now, when a man against whom there is a demand promises to pay it, for the necessary facilitating of business between man and man, every thing must be presumed against him. Stevens v. Lynch was the case of a drawer of a bill of exchange, knowing that time had been given, but apprehending that he was still liable, three months after it was due, said, “ I know I am liable, and if the acceptor does not pay it, I will.” The court said, the defendant had made the promise with a full knowledge of the facts, three months after the bill had been dishonoured, and could not now defend himself, on the ground of his ignorance of the law. Equally strong to the same point, are the cases of Potter v. Rayworth, 13 East 417. Gibbon v. Coggan. 2 Camp. 188. and Jones v. Mor *312 gan, 2 Camp. 474. It need hardly be remarked, that if (as these cases shew) ignorance of law, furnishes no ground of defence against a promise to pay, still less can this same plea of ignorance give to a party, who has actually paid money, a action to recover it back.
In Brisbane v. Dacres, the captain of a king’s ship brought home in her, public treasure upon the public service, and treasure of individuals for his own emolument: he received freight for both, and paid over one third of it, according to an usage established in the navy, to the admiral under whose command he sailed: but discovering after-wards, that the law did not compel captains to pay to admirals one third of such freight, he brought this suit to recover it back. The court decided, unanimously, that as to the part of the freight arising from the money carried for individuals, no action lay, because being an illegal transaction, no aid would be given by the courts to either party; and as to the freight arising from the public treasure, they decided, three to one, that the action would not lie, because the mo- ■ ney was paid voluntarily with full knowledge of the facts. The opinion of Gibbs, J. (who reviewed all the cases) is .'particularly strong. He remarks, among other things—i We must take this payment to have been made under a demand' of right; and I think, that where a man demands money of another as a matter of right, and that other, with a full knowledge of the facts upon which the demand is founded, has paid a sum, he never can recover back the sum he has so voluntarily paid. It may be, that upon a further view, he may form a different opinion of the law; and it ma3r be, his subsequent opinion may be the correct one. If we were to hold otherwise', I think many inconveniences may arise; there are many doubtful questions of law: when they arise, the defendant has an option, either to litigate the question, or to submit to the demand, and pay the money. Ijhink, that by submitting to the demand, he that pays the money gives it to the person to whom he pays it, a!nd makes it his, and closes the transaction between them. He who receives it, has a right to consider it his, without dispute: he spends *313 it in the confidence that it is his: and it would be most mischievous and unjust, if he who has acquiesced in the right, by such voluntary payment, should be at liberty, at any time within the statute of limitations, to rip up the matter, and recover back the money. He who received it, is not in the same condition : he has spent it in the confidence that it was his, and perhaps has no means of repayment.” After reviewing some cases, which were decided while he was at the bar, he says—“ Among all the practitioners of the court of king’s bench, where questions of this sort very frequently arise on insurance transactions, we were universally of this opinion, that where the money was paid with a knowledge of the facts, it could not be recovered back.” In the same case, Heath, J. compared the case to that of Marriott v. Hampton, in which the plaintiff sought to recover back the amount of a debt recovered by law from him, when he had in fact paid it, but had mislaid the receipt, which he after-wards found ; but it was held that the action was not maintainable. “ That (he said) was the case of judicium redditum in inviium: but this is a stronger case; for the plaintiff is a judge in his cause, and decides against himself; and he cannot be heard to repeal his own judgment.” Chief justice Mansfield, after stating the circumstances under which the money was paid and received, says—“ So far from its being contrary- to cequum el honum” (for the admiral to retain the money) “ I think it would be most contrary to cequum el honum, if he were obliged to repay it. For see how it is : if the sum be large, it probably alters the habits of his life, he increases his expenses, he has spent it over and over again; perhaps, he cannot repay it at all, or not without great distress: is he then five years and eleven months after, to be called on to repay it?” 3’hese opinions seem to me to combine strong practical sense with sound law; which must be my apology for quoting so largely from them.
The case of Skyring v. Greenwood, is also very strong to the same effect. There the paymaster of a military corps, had in an account rendered, given credit to major Skyring, from the 1st January 1817 to the 5th November 1820, for *314 certain increased pay, erroneously supposed to be granted by a general order to officers in his situation. This increased pay had been stated by the board of ordinance, to the paymaster, to be inapplicable to major ¿Skyring, in December 1816, yet he gave the major no notice of this till 1821. The pa}nnaster continued to receive the major’s pay till his death in 1822. His representative brought this action against the paymaster, for his pay in arrear; and on the trial, the defendant wished to set-off against such arrears, the increased pay for which the major had been credited from 1817 to 1820, and which the board of ordinance had refused to allow the pajunaster. It was admitted by his counsel, that if there had been an actual payment with a knowledge of the facts, there could have been no set-off: but they contended, that there never was any payment; that the defendant had merely rendered an account, in which he had, by mistake, allowed the major credit for sums to which he was not entitled ; and that they ought in justice to be allowed to correct the error. But the court unanimously refused to suffer the set-off; saying, that by suffering the major to consider himself entitled to this increased pay, the defendant had been guilty of a breach of duty towards him, and that this breach had probably influenced him to spend more money than he otherwise would have done.
Milnes v. Duncan was a case of money paid under a mistake of fact, and a suit to recover it back; in delivering their opinions, the judges consider as settled law, the distinction between an ignorance of law, and of fact. Thus, Bayley, J, says—“ There is no doubt as to the rule of law applicable to this case. If a party pay money under a mistake of law, he cannot recover it back. But if he pay money under a mistake of the real facts, and no laches are imputable to him (in respect of his omitting to avail himself of the means of knowledge in his power) he may recover back such money.”
I shall cite one more english case, which I passed by in the regular series; Martin v. Morgan, 1 Brod. & Bing. 289, 5 Eng. C. L. R. 87. The defendants presented for pay- *315 merit, a post-dated check, knowing 'it to be post-dated, and that the maker of it was insolvent; and the plaintiffs, in ignorance of these circumstances, paid the check for the honour of the maker, expecting funds from him in a short time, though they had none at the moment. This suit was to recover back the money so paid. Chief justice Dallas said,—<! In this case the plaintiffs wore certainly entitled to recover. The rule of law is, that where money is paid with full knowledge, or with full means of knowledge of the circumstances attending the demand, the party paying it is not entitled to recover back such payment, though made without sufficient consideration. But if the money be paid without such full knowledge, or means of knowledge, or if the party he induced to pay it under false representations, he may recover back money paid under such circumstances.” Park, J. said—“ The law was never doubted, that where a party pays with full knowledge of the circumstances, he cannot recover back what he has paid; but where he pays in ignorance, and without consideration, the receiver cannot retain against him.”
The same doctrine has been recognized as settled, in several cases in this court, cited by the counsel for the appellants.
It was objected that though this should be considered good 'law as between individuals, it did not apply between this corporation and the corporator. But I cannot see why. The corporation lays the tax to be sure, and may enforce its ordinance according to its understanding of it; and if in this case the money had been collected by coercion, it would have been a different matter: but the case agieed states, that the payment was voluntary, made according to plaintiff’s understanding of the law, and to an officer who had no means of coercion. The corporation received this money as its own, and no doubt spent it as its own: and how much more it may have received under the same construction of the law, we do not know. I am clearly of opinion, that the judgment should be reversed, and judgment entered for the defendants.
O'ahkll, ./. concurred.
*316 Tucker, P.
By the ordinance of the common council of Richmond of the 18th November 1811, which authorized the appointment of auctioneers, it was among other things provided, that no person should sell any goods at auc^011 without license, except his oion. By the ordinance of July 1818, the former ordinance was re-enacted in the same terms, except that the above exception was stricken out. The true interpretation, then, of the present ordinance, must be, that no person shall sell even his own goods, without having obtained a license. By another clause, it is provided, that auctioneers shall pay to the chamberlain for the use of the corporation three fourths of one per cent, on the amount of all sales by them made at public auction. And the question is, whether the sale at auction of his own goods by Judah, is within the operation of this clause. I am of opinion that it is. Take the clause as it stands (unconnected with other clauses) and there can be no room for doubt. The language is as general as it can be. It is the language of universality. And if these comprehensive words all sales by them made, do not comprehend the sale of his own goods at auction, what words could be used to comprehend them. But it was contended, that the other clauses of the ordinance, and the language of the license, confine the meaning of this clause to the sale of goods which are confided to the auctioneer’s care; that is to say, the goods of others, not to his own goods. I do not think so. The opposite inference is, perhaps, more natural. The common council had the distinction in mind, between his own goods, and the goods confided to his care: and hence it is fair to conclude, that if it had designed that distinction in the clause imposing the tax, it would have made it. It could not have forgotten it; for the same distinction is kept in view, in the afterpart of the same clause, in reference to the condition of the license bond. As, therefore, no discrimination was made in the taxing clause, though the matter was present to the mind of the council, we may fairly conclude it intended no discrimination. If we look for the explanation of the insertion of the words u all articles confided to their care,” in some of the *317 clauses, we shall perhaps not find it difficult of discovery. These words are found in the clause authorizing a license to be granted to sell all articles which may be confided to the care of the auctioneer, and in the clause directing the bond, the condition of which is to be in correspondent language. Now, as a bond with condition to account and pay to himself would be an anomaly, it was provided, that the bond should be conditioned to account for the sales of the goods confided to his care. And as the bond and license ought to correspond, it might have occurred to the draftsman that it would be proper to use the same language in the clause which prescribes the issuing of the license.
Indeed, the only difficulty in the construction of the law, if we stick to its letter, is, that the license does not in terms authorize the auctioneer to sell his own goods at all, at public auction. It is a license to sell the goods only, which shall be confided to his care. And thus, Judah would be liable to the penalty of selling without license, unless we take shelter from this consequence again, under another literal construction, that the act imposes the penalty upon those only who have not obtained a license as directed by the ordinance, and that he has in fact obtained such a license as directed by the ordinance, although it is not a license to sell his own goods. I think this literal interpretation of the ordinance, is not its true construction. The license to sell the goods of every other merchant at public auction, must, in all fairness, be interpreted to be a license to sell his own in the same way and upon the same terms. If he has no license to sell his own, then it would follow, that each auctioneer, instead of selling for himself, must pass over his own goods to another to sell for him ; an inconvenience that cannot be presumed to have been designed. It must be taken, therefore, that it was intended, that he should have a right to sell his own. Then the taxing clause comes into operation, and, by a sweeping phrase, obliges him to pay the tax upon all sales by him made at auction; thus comprehending sales of his own goods as well as others. It w’ould, indeed, have been strange had it been otherwise. What reason *318 can be assigned for the auctioneer’s own private goods being brought into market free of the auction duty, when those of others come into it loaded not only with the auction duty, but with auctioneer’s commissions, and with the losses and exPenses incidental, in many instances, to the sale at auction by another ? I cannot perceive. I am, therefore, of opinion, that the construction which Judah himself, and the common hall (I presume) have put upon the ordinance, is the correct construction, and that the tax of course was properly paid to the chamberlain.
In this-view of the case, the other question which was argued at the bar, would not seem to require to be decided, since, whatever may be its merits, the judgment of the circuit court should be reversed, and judgment entered for the defendants. But as part of the court have preferred to decide the cause upon that point, it is proper that I should state my impressions of it also.
The question presented, is whether the money paid by Judah to the chamberlain, supposing it paid under a mistake of the law, can be recovered back by him, in this action ?
There is, perhaps, no point upon which, of late years, the resolutions of the courts have been better considered or more explicit, than the inability of a party to recover back what he has paid under a mistake of the law. A mistake of fact, indeed, is often deemed a sufficient ground of reclamation ; and if money be extorted by one holding an official station for fees of office which are not due in law, that too may be recovered back; because it is a part of the policy of the law, to discountenance the extortion of its officers, by considering as void any payment which is made to them, in compliance with their unlawful demands. It is on this latter principle, that the cases of Dew v. Parsons, Morgan v. Palmer, and Rose v. Shore, cited at the bar, were decided. So also Irving v. Wilson, 4 T. R. 485. Miller v. Aris, 3 Esp. Rep. 231. But where cases cannot be brought within the influence of this principle, I think it is well established, that a party cannot, upon the ground of *319 mistake in law, recover back money paid under the influence of that mistake. The rule may sometimes, indeed, operate hardly and debar a party of his just right; but not more so than the statute of limitations, or many other principles of the law, which have been adopted with a view to general policy, without reference to particular inconvenience.
Among these rules, there is none more important, than that which is embodied in the maxim, interest reipublicce ul sit finis litium. When a matter has once been settled by the adjudication of a court, it can never again be re-examined or called in question, though, by subsequent adjudication upon the same matter of law, it shall appear that it was mistaken by the tribunal which first decided it. The supernumerary officer Roane, against whom this court rendered judgment in 1797, in the case of Innes v. Roane, 4 Call 379. is barred and forever precluded by that judgment, although this court has since decided, that the law was mistaken by the former court, and has rendered judgments in favor of others upon a different construction of that law. Roane or his representatives thus find themselves excluded from his claims for half pay, while the treasures of the nation are lavished upon his brother officers, whose claims were identical with his own. Why shall he not be permitted to avail himself of this mistake of the law? Because it has passed in r&m adjudicatum, and because it is the hue policy of the state, that there shall be an end of litigation. How absurd would it be, were it otherwise! 'What is or is not law, is often, unfortunately, matter of opinion ; and the case just cited shervs, that the wisest and best men may differ in their construction of a statute. And if we were to admit the claimant Roane to reassert his claim, on the ground of a mistake of the iarv, how could the same right be denied to the commonwealth at some future day, when death shall have swept away the present court, and have filled our seats with those of different views of the revolutionary laws alluded to. In the very case before us, the able judge who decided the cause in the circuit court, thought the corporation not entitled to the money paid *320 by Judah. I am of a different opinion, and as it is just as possible that I may be wrong as that he is, so others may hereafter disagree with me and side with him. But, to permit the parties to re-examine and reverse the judgment now to finally pronounced, every one can perceive would be grievously pernicious. It is, therefore, properly esteemed a fixed principle of law, that a judgment between the parties is final and conclusive of their rights, unless reversed and annulled by a superiour tribunal, according to the established law of the land.
Now, the same principle (though, perhaps, for reasons not altogether as forcible) pervades many other doctrines of the law. Thus, where a matter is left to arbitration, upon a mere naked question of law, the award thereupon cannot be disturbed for a mistake of the law; Ching v. Ching, 6 Ves. 282. Young v. Walter, 9 Ves. 364. Smith v. Smith, 4 Rand. 95. So, where parties have a dispute or difference, and they enter into a compromise, the compromise cannot be disturbed, though it appear that it took place under a mistaken impression of the law. Lyon v. Richmond, 2 Johns. Ch. Rep. 60. For a party shall not be permitted to set aside a compromise, on the ground that the right of the case was on his side, since if this were permitted there could be no valid compromise, as on this principle one or other would always have a right to call it in question. Penn v. Baltimore, 1 Ves. sen. 444. Cann v. Cann, 1 P. Wms. 727. Moore v. Fitzwater, 2 Rand. 442. In like manner, where a party, has sued for his demand, and the defendant, instead of contesting it, pays it, he cannot recover back what he has paid, however clear it may be that the payment had been made under a mistaken sense of obligation; Bilbie v. Lumley, and- Brown v. M’Kinally, cited at the bar. For he has undertaken to judge for himself. He has not thought it necessary to submit his rights to a judicial tribunal. He has settled his controversy with his adversary by his own act, and his adversary had a right to presume that that controversy was no longer left open and unsettled. He had a right to presume that it was closed forever! The *321 courts, therefore, will not listen to a reclamation on the part ^ ' of the defendant, on the ground that lie had mistaken the law; for every man who undertakes to act for himself upon liis knowledge of the law in the settlement of his transactions, ought to be charged on his peril with a knowledge of the law; Lyon v. Richmond, before cited.
The transition from these cases to that of a party paying money which he supposes to bo due, under a mistake of the law, is easy and natural. For, in doing so, he undertakes to settle the question of right himself, and he ought no more to be permitted to call in question his own act, than in the former cases. If he was aware that the question admitted of two opinions, he has, by making payment, undertaken to decide between them for himself, and has'waived the decision by judicial tribunals for him. It is in 'this sense that Heath, J. considers the party as concluded by being a judge in his own cause. If on the other hand, he was really ignorant of the doubts which hung over his obligation to pay, yet it was his own fault and folly, not to use due diligence in his affairs. That there should be a right of reclamation in every case, howrever doubtful, would be confessedly most mischievous. And, on the other hand, what apology has the party for a payment, where the case is clearly against his obligation to pay ? He must suffer the penalty of his negligence; a penalty which the law frequently imposes in relation to matters of litigation. It is no greater hardship than to be refused the aid of equity against an unrighteous judgment, because lie has not defended himself at law. Nor is it a greater injustice, than to compel him to abide by a judgment or an award on a mere naked question of law, when it is clear to our minds, that that judgment or award resulted from a mistake of the law. The truth is, there is an absolute necessity for some rule by which to determine what is to be considered as settling, closing and forever putting to rest, transactions between parties. The law has accordingly fixed upon that which has been mentioned in relation to judgments, awards, compro *322 mises, and voluntary payments. It is for the peace and happiness of society, that it declares that no man who has made a voluntary payment shall be permitted to allege it was made under a mistake of law, since it is so easy to affirm> and so difficult to disprove such ignorance. It is better, that here and there an individual should suffer injury, from the very rare occurrence of his paying what he was not bound to pay, than that we should at one blow annihilate all finality in the transaction of business. Men’s affairs, instead of being settled by payments, would be still left open and unsettled. The payer would not be bound by his payment, nor the creditor by his release; for, pari rations, he too must be entitled to the benefit of this noxious principle of unravelling transactions, whenever he can shew, or fancy he can shew, that he has mistaken his obligations. And thus it would happen, that the payment of money would soon become but the parent of a suit, and the settlement of an account the harbinger of litigation.
Though I do not design to enter upon a review of the cases upon the subject, since that duty has been already so ably performed by judge Carr, I cannot pass unnoticed the remarks of chief justice Abbott in Skyring v. Greenwood. They appear indeed novel, and almost startling at first, but are, upon reflection found to be in keeping with some of the cardinal principles of the law. He says, in reference to this right of reclamation, and its ruinous effects upon a defendant—“ They (the paymasters) suffered him to suppose during all the intervening time, that he was entitled to the increased allowances. It is of great importance to any man, that he should not be led to suppose, that his income is greater than it really is. Every prudent man accommodates his mode of living to what he supposes to be his income. It, therefore, works great prejudice to any man, if, after having had credit given him in account for certain sums, and having been allowed to draw on his agent, on the faith that they belonged to him, he may be called upon to pay them back.” The law seems to me, in many re *323 spects, to act upon a similar principle. At common law, though a man held the estate of another for fifty years, he could recover from him no damages on account of profits ; for he held, claiming to enjoy it as his own. So even now, trespass for mesne profits is barred as to all but five years: why? because it bears hard upon a man who has enjoyed an estate, supposing it to be his own, to be compelled to refund what long since he may have spent without a consciousness of wrong. Some bounds are, therefore, set to the right of reclamation, by that power, from which is derived the right of property, and which assumes the sovereign authority to prescribe rules for its enjoyment. It reminds us of what we are too apt to forget., that our right of property is not inherent, but derived merely from the regulations of society.
I do not think it necessary to push to all its consequences, the principle of reclamation of money voluntarily paid. Whenever we shall incline to retrace the steps of those who have gone before us, it may be well to look beforehand at some of the difficulties of such a course, and to settle the principles which shall govern the new doctrine. We must inquire, whether an implied assumpsit can be raised from the receipt of money -upon a claim of right, without fraud or oppression, consistently with the cases which deny that this action will lie, where the idea of a contract to pay, is excluded by the circumstances. Stokes v. Lewis, 1 T. R. 20. Child v. Morley, 8 T. R. 610. And we must decide, not only what is to be the limitation to this right of recovery, but from what time the limitation shall begin to run. Shall it be from the time of the discovery of the mistake, a matter in the cognizance of the party only? or shall it run from the time of payment? This would, indeed, seem most reasonable,'—yet if mistake of law is the ground of action, why should the party be rigorously held to have been bound to bring his action before ho discovered his mistake ? To hold him to that rigour, is to assert his obligation to know the law, in the very act of giving relief against his ignorance of the law.
*324 Upon the whole, I am satisfied, that the principle established by the cases is the true principle, and that on this point also the judgment is erroneous and should be reversed.
Judgment reversed.